## ·BOARD OF COMMISSIONERS OF PARK COUNTY v. BOARD OF COMMISSIONERS OF BIG HORN COUNTY.

(No. 886; Decided July 18th, 19,17; 166 Pac. 674.)

Counties—Formation of New Counties—Apportionment of Indebtedness Between Old and New County—Apportionment of Expenses Between Counties—Evidence—Admissibility of Opinion Evidence—Findings of Fact—Review—Burden of Proof—County Records—County Warrants and Certificates—Apportionment Taxes—Proceedings to Apportion Indebtedness and Expenses—Prejudicial Error—Words and Phrases.

1. Under the provisions of Compiled Statutes, Sections 1061-1066, prescribing the method and procedure for apportioning indebtedness and expenses between the old county and a new county formed out of territory taken and detached from the old county, claims which existed as valid debts of the original county on the date of the organization of the new county, although not reduced to judgment until after that date, were properly included as a part of the indebtedness of the original county in a proceeding for apportionment.

2. The word "immediately" as used in Compiled Statutes, 1910, Section 1063, directing the commissioners of an original county from which a new county is formed, to make their report to the court for apportionment, means as soon as practicable, since it is a relative term having relation to the course of business in which it is used and may mean a reasonable time in view of the circumstances of the case.

3. In a proceeding for the apportionment of indebtedness between an original county and a new county formed from its territory, it was competent for witnesses to state their opinions in connection with the facts as to the levy and efforts made to collect delinquent taxes, and as to the collectability of such taxes. It was also proper for such opinion evidence to be given such weight as it was deemed entitled to in connection with the facts, in the determination of values for the purpose of arriving at a just and equitable apportionment of the indebtedness of the original county as equitable principles rather than technical rules of law should be applied.

4. In a proceeding for the apportionment of indebtedness between an original county and a new county formed from its territory, a finding fixing the value of delinquent and unpaid taxes much in excess of that reported by the old county and as estimated by witnesses, will not be disturbed on the ground that the witnesses improperly took into account the probable cost of collecting said taxes in giving their evidence of the value thereof.

5. In a proceeding to apportion indebtedness between an old and a new county created from territory of the former, evidence held sufficient to sustain findings that prior to the formation of the new county, the old county had leased a site to a library association acting as a corporation under Compiled Statutes, 1910, Sections 1316-1321, upon which site a library building had been erected by said association prior to the formation of the new county, with funds derived by gift in the sum of $15,000.00 which had been lawfully accepted on condition that said library would be furnished and maintained by public taxation, and that the library building and books purchased therefor are the property of such association and not property of the county to be considered as an asset in apportioning indebtedness between the old and the new county.

6. The fact that there was no proof of the incorporation of the library association was immaterial, since it was not a party to the proceeding, and an entire failure to show that it had been duly incorporated would not make the original county the owner of the property acquired by the library directors in their capacity as such.

7. So far as the ordinary rules as to burden of proof apply, the burden was upon the new county to establish its claim that library property in the original county was public property of the original county.

8. Books containing records of instruments affecting the title of real and personal property within the original county and the cost of transcribing and recording the matter therein, while for some purposes are to be regarded as public property are not in view of the requirements of Laws 1911, Chapter 80, that a new county formed from the old, shall pay the expense of obtaining necessary records and of transcribing or photographing such records of the old county as affect the title of real or personal property within the new county, are not the kind of property contemplated by the statute to be accounted for in an apportionment proceeding between an old county and a new county created therefrom.

9. The amount of all unpaid county warrants and certificates of indebtedness which have been issued for a period exceeding twelve months, and for that reason cancelled by the Board of County Commissioners under authority of Compiled Statutes, 1910, Sections 1201-1202, should, if issued less than five years prior to the organization of a new county comprising territory carved from the old county wherein they were issued, be included as a part of the indebtedness of the original county in a proceeding for the apportionment of indebtedness between such old county and the new county created therefrom, since the object of the provisions of the statute is not to cancel the original indebtedness, but to cancel the obligation of the warrant or certificate possibly to stop the accumulation of interest.

10. A finding as to delinquent taxes which stated the amount thereof on the date of the organization of the new county, the amount that had been collected up to the time of the hearing, and the amount and value of taxes remaining uncollected was sufficient, since the evidence did not refer to the taxes in detail, and all the court could do was to value the same upon the facts brought out in the evidence.

11. It was not necessary to make a finding as to the rate of interest on outstanding indebtedness where such rate is fixed by statute.

12. In view of the provision of the statute requiring commissioners of the original county to state in their report the date when outstanding indebtedness became due, and that the court, upon finding the amount to be charged the new county, shall order its board of county commissioners to issue warrants payable to the order of the original county at a time not later than the time when the indebtedness shall become due, the action of the court in ordering a

warrant payable to the new county at a time later than that when such indebtedness would become due is not prejudicial to the new county.

13. A finding as to the value of a county court house square in proceedings for the apportionment of indebtedness between an old and a new county created therefrom, that the old county was the owner of it and that the value of the court house square and building thereon, known as the county offices and the county jail, subject to a lease on a part of said square made to a library association for library purposes was a sum stated, was proper. The leased site of the library building was not excluded from the finding as to the value of the court house square.

ERROR to District Court, Park County; HON. WILLIAM C. MENTZER, Judge.

Proceedings for the apportionment of indebtedness as between the Board of County Commissioners of the County of Park and the Board of County Commissioners of the County of Big Horn. From the judgment the Board of County Commissioners of the County of Park bring error. The material facts are stated in the opinion.

*R. L. Donley* and *E. E. Enterline,* for plaintiff in error.

The court erred in denying the motion made by plaintiff in error for more specific findings; there was no finding as to the amount of delinquent taxes valid and collectible prior to January 3rd, 1911. The rule as to value of delinquent taxes was settled in In re. Apportionment Fremont and Big Horn Counties, 8 Wyo. 1. The court erred in not finding when the indebtedness of Big Horn County existing January 3rd, 1911, became due and the interest rate thereon. (Comp. Stat. 1910, Sec. 1065.) The court erred in not finding that the library building belonged to Big Horn County, January 3rd, 1911. The value of the court house square should have been found without excluding the library building site. The court erred in admitting the introduction of the court files relating to claims of J. L. Mullen and of Sheridan County, as said claims could not have been considered had the Commissioners of Big Horn County made their report as re-

quired by Section 1063, Comp. Stats. 1910. The court erred in admitting opinion evidence of county officers as to the collectibility of delinquent taxes, as well as evidence of the probable cost of collecting delinquent taxes. There was no evidence as to whether alleged delinquent taxes were valid and equitable January 3rd, 1911, and the rule applied was in conflict with the decision of this court in In re. Fremont and Big Horn Counties, supra. There was no evidence of the corporate existence of Big Horn County Library Association. The method of proving existence of a corporation is prescribed by statute. (Sec. 3975, Comp. Stats. 1910.) . The testimony of the witness Harris as to the lease made to the Library Association was incompetent. Findings as to the value of the court house square are not supported by evidence nor made according to law. (Forest Co. v. Langdale Co., 91 Wis. 543.) There was evidence that the value of the court house square and county buildngs, exclusive of the library building, was $27,500.00. There was evidence that the value of the unpaid delinquent taxes was $8,461.42. The library donation of $15,000.00 was made to Big Horn County and it is the owner thereof. (Brown v. Rock Co. (Neb.), 70 N. W. 943.) The Library Association, even if incorporated, which was not proven, is a mere county agency. (Sec. 1320, Comp. Stats. 1910.) Six hundred and seventy-nine dollars was used for the purchase of books for the library and said books are the property of Big Horn County. There was evidence that the county records were of the value of $170.00 per volume; they are county property and should have been included as such. (State v. Mundson, 135 N. W. 1117.) Cancelled warrants aggregating $1,108.76 should have been deducted from the indebtedness of Big Horn County and disregarded in making the apportionment; $41,-495.42 should have been added to the assets of Big Horn County; $95,316.61 should be deducted from the total indebtedness found by the trial court. Park County is not indebted to Big Horn County in any sum whatever.

*W. S. Collins* and *E. E. Lonabaugh,* for defendant in error.

The motion made for more specific findings of fact was properly overruled. The rule announced In re. Apportionment Fremont and Big Horn Counties, 8 Wyo. 1, with reference to delinquent taxes, is not as strict as contended for by counsel. Only such as are equitable should be charged. Error in not making specific findings of fact cannot be made a basis for reversal when the entire record is before the court, unless error is clearly shown. (Oxford v. Columbia, 380 O. S. 87; Levi v. Daniel, 22 O. S. 38; Oliver v. Moore, 23 O. S. 473.) The Mullen and Sheridan County judgments were properly charged as indebtedness, even though not reduced to judgment until after the organization of Park County; the method followed in computing the value of unpaid delinquent taxes was fair and equitable. Opinion evidence given by county officials as to the collectibility of delinquent taxes is admissible in the discretion of the court. (Valley Co. v. Reed Co., 147 Pac. 238; Wichita Falls & N. W. R. R. Co. v. Macalary, 144 Pac. 583; Chicago Co. v. Ohio Company, 214 Fed. 757; Lawson on "Expert and Opinion Evidence," at pp. 431, 432, 439.) Delinquent taxes are in the nature of outstanding accounts and opinion evidence is admissible to show the value thereof. The value of unpaid delinquent taxes as fixed by the court was less than was shown by the evidence. The same rule applies in the valuation of the court house square. Findings based on conflicting evidence will not be disturbed on appeal. (Fein v. Town, 2 Wyo. 113.) Unless clearly against the weight of evidence. (Ramsford v. Massingale, 5 Wyo. 1, 35 Pac. 774; Ketchum v. Davis, 3 Wyo. 164, 13 Pac. 15; Hester v. Smith, 3 Wyo. 291, 40 Pac. 310; Jackson v. Mull, 6 Wyo. 55, 42 Pac. 603.) Where findings of fact are assailed, the only question is whether there is sufficient evidence to support the findings and not whether the appellate court would come to the same conclusion from the written report of the evidence. (Conway v. Smith Merc. Co., 6 Wyo. 468, 46 Pac. 1084; Slothower v. Hunter, 15 Wyo. 189, 88 Pac. 36;

Kimball Co. v. Payne, 9 Wyo. 441, 64 Pac. 673.) The evidence as to the value of the court house square was conflicting and the above rule applies. Park County is not in position to object to the corporate capacity of Big Horn County Library Association. It had accepted a donation of $15,-000.00 from Andrew Carnegie and had constructed the library building. Strict proof of corporate existence is not required where the corporation is not a party. (Abbott's Trial Evidence, p. 25.) Proof of its existence de facto is sufficient. (Id. 30.) Big Horn County dealt with the association as a corporation and Park County is bound by the dealings of the parent county. The library property was properly excluded as an asset of Big Horn County. The statute, Sections 1316 to 1321, Comp. Stats. 1910, provides for the organization of county library associations. The library is more in the nature of a liability, since the county is required to maintain it. Roads and bridges causing large sums are not county assets. (Highway District v. Ada County, 134 Pac. 542; State v. Carbon County, 114 Pac. 522; Reid v. Lincoln County, 125 Pac. 429; State v. Rich, 140 Pac. 731; Elliott on Roads and Streams, Sec. 44.) Donated libraries should not, therefore, be considered assets. The library site under lease for ninety-nine years is likewise impressed with the character of trust property and has no present value as an asset of Big Horn County. The same rule applies to books purchased for the library; the value of deed and mortgage records are not chargeable to the parent county as an asset. The North Dakota case, State v. Amundson, cited by counsel, is distinguishable from the case at bar in view of Section 2336, North Dakota Statutes, permitting the cost of public property to be charged as an asset. Out statute, 1061-1066, clearly shows that county records were not intended to be included as assets of the parent county. They have no commercial value, no sale value and our statute, unlike the Dakota statute, does not provide that their first cost shall be taken into consideration in apportionment proceedings. The cancellation of unpaid county warrants authorized by Section 1201, Comp. Stats. 1910,

does not extinguish the debt until five years after their date. No finding as to interest rate on county indebtedness is necessary when it is fixed by statute. (Sec. 3357, Comp. Stats. 1910.) Plaintiff in error cannot complain that it was charged but 6 per cent per annum interest, when the indebtedness of Big Horn County on judgments were drawing 8 per cent per annum. Certificates of indebtedness did not draw interest. (Sec. 1130, Comp. Stats. 1910.) The judgment indebtedness and bonded indebtedness on which the rate of interest is either fixed by law or agreed upon by the parties exceeded the total net indebtedness owing by Big Horn County on January 3rd, 1911, as found by the court. As the greater portion of Big Horn County's indebtedness was past due on January 3rd, 1911, there should be no presumption that the trial court erred in directing the Commissioners of Park County to issue warrants payable January 1st, 1917. The legal rights of Park County were not adversely affected by an order requiring it to pay its portion of this indebtedness six years from January 3rd, 1911. The decision of the trial court having been based on justice and equity between the two counties should be affirmed.

Potter, Chief Justice.

The County of Park, having been created out of territory taken from Big Horn County, completed its organization on January 3, 1911. In the statutory proceedings, in the District Court sitting in and for Park County, for the apportionment of the indebtedness of Big Horn County existing at the date of the organization of said new county, it was found and adjudged by said court that Park County should assume and pay to Big Horn County the sum of $11,310.72, as its proportion of said indebtedness, together with interest thereon at the rate of six per cent per annum from the said date of its organization to December 18, 1915, the date of judgment, amounting in the aggregate to the sum of $14,674.32. And said Park County was ordered by the judgment to issue a warrant to Big Horn County for that amount, bearing interest at the rate of six per cent per

annum and payable on or before January 1, 1917. The find-
ings and judgment were excepted to by both counties, and
Park County has brought the case here on error, asking a
reversal of the judgment.

The statute provdes that any county formed and organ-
ized out of territory taken or detached from another organ-
ized county shall be held liable for the payment of a just and
equitable proportion of the indebtedness of said county, and
the rule and proceeding for apportioning said indebtedness
are also provided by statute. (Comp. Stat. 1910, Secs. 1061-
1066; In re. Apportionment Between Fremont and Big
Horn Cos., 8 Wyo. 1.) The proportion of the indebtedness
to be borne by the new county is fixed by the statute (Sec.
1062) at the same ratio to the whole amount of the indebt-
edness as the assessed value of the real and personal prop-
erty of the detached territory bears to the assessed value of
the real and personal property of the whole original county,
such values to be ascertained from the last annual assessment
made before the establishment of the new county. And
upon that basis the proportion of the existing indebtedness
to be borne by the new county is to be determined, after
deducting its proportion in the same ratio of the value of all
public property, moneys and credits of the original county,
except that any of such public property located within the
new county may be apportioned and its value charged to the
new county. (Sec. 1065.)

There is no dispute in this case as to the ratio or basis
for determining the proportion of the indebtedness to be
borne by the new county. That, as well as the larger part
of the alleged indebtedness, was agreed upon by stipulation
at the hearing in the District Court. The controversy here
relates principally to a few items reported by the Commis-
sioners of Big Horn County as part of its indebtedness, the
value of certain property and credits of the original county,
and the right of that county to have certain other property
excluded from the apportionment.

1. The statute aforesaid provides that the Commission-
ers of the original county shall immediately report to the

District Court of the district within which the new county is located, and to the District Court within that county, if organized, or if not then to the District Court in the county. adjoining the new county, the amount of the indebtedness of the original county, the nature thereof, when the same becomes due, and the rate of interest thereon, together with the assessed value of the real and personal property of the original county and the detached territory, the amount, nature, value and location of all public property of the original county, and all moneys and credits of said county; said report to be verified by the affidavit of the chairman of the board, and accompanied with proof of the organization of the new county, and a statement of its boundaries. (Comp. Stat., Sec. 1063.) This institutes the apportionment proceeding, and thereupon the court or judge is required to cause a notice of the making of said report to be issued and served upon the chairman of the Board of Commissioners of the new county, and specifying the time and place for the hearing upon said report. (Id., Sec. 1064.) As above stated, the organization of Park County was completed on January 3, 1911, but the report of the Commissioners of Big Horn County provided for as aforesaid was not filed with the District Court until December 3, 1914. Among other items of indebtedness reported were two judgments against the county rendered after the date of the organization of Park County, but for debts alleged and found by the court to have been valid and existing debts of the original county at the date of the organization of the new county. One of said judgments was rendered on April 19, 1911, for $13,407.30, including interest; and the court found that the amount of the claim represented by the judgment due on January 3, 1911, was $13,087.96, with interest thereon from December 28, 1910. It appears that said indebtedness was for work and labor and material furnished during the year 1910 in the construction of bridges, and that the claim therefor had been presented to the Commissioners of Big Horn County on December 28, 1910, but disallowed by them "for lack of funds" on January 5, 1911. The other judgment

referred to was rendered on November 12, 1913, for $1,649.60, and said amount was found by the court to have been a just and valid debt of the county at the date of the organization of Park County. The claim represented by this judgment seems to have been presented in September, 1911, without action thereon by the board. The court included the amount of the claims represented by these judgments that was due and existing on the date of the organization of Park County as part of the indebtedness of Big Horn County.

Upon the ground that they had not been allowed or reduced to judgment before Park County was organized, it is contended that it was error to include such claims as part of the indebtedness to be apportioned. But the evidence clearly shows that said claims existed as just and valid debts of the original county on the date of the organization of the new county. And the court having so found, the fact that they had not been presented or allowed or reduced to judgment prior to such organization does not constitute a sufficient reason for excluding them from the apportionment. The contention for their exclusion seems to be based upon the provision of the statute that the commissioners of the original county shall "immediately" make their report of indebtedness, assets, and assessed values. Counsel argue that if the report had been filed within the time specified by the statute neither of the claims could have been considered at the hearing and, apparently because not allowed, that they were not valid claims when the new county was organized. But that they were valid and just claims at that time was established by the judgments rendered before the hearing in this case, and clearly they must be so treated regardless of the delay in instituting the apportionment proceeding. We are not prepared to agree with the argument that if the report had been filed before the judgments were rendered the claims could not have been considered at the hearing. The claims might have been allowed or the judgments rendered between the date of filing the report and the hearing, and the report might have been amended to include them, and

we perceive no reason why they might not then have been considered at the hearing and included in the apportionment, upon a sufficient showing that they represented valid and existing debts of the original county at the date of the organization of the new county. Moreover, it is not certain, even if probable, that the hearing would have occurred prior to the judgment of April, 1911, if the report had been made at the earliest practicable moment, assuming that it was not made as soon as it might have been.

Although the statute uses the word "immediately" in specifying the time for the report, it is evidently not used according to the ordinary import of the word as directly or without any intervening time, but rather as meaning, as soon as practicable—as soon as the nature of the work or duty will permit. "Immediately" is said to be a relative term, having relation to the course of business with which it is used, and may be held to mean within a reasonable time in view of the circumstances of the case. (See Words & Phrases, Vol. 4, p. 3403, 2nd Series, Vol. 2, p. 947; 21 Cyc. 1731-1735.) It must receive a reasonable construction in view of the purpose of the statute and duty required. There is nothing in the record to show whether it was practicable for the report to have been made at an earlier date or whether the delay was reasonable or otherwise. No objection appears to have been made to a consideration of the report on the ground that it was not made within the time specified by the statute, even if such an objection might properly be entertained, a question we do not decide. The judgments establishing the claims as valid debts at the time of the organization of the new county having been recovered before the hearing in this proceeding, that must be held sufficient. The new county ought equitably to bear its proportion of those debts.

2. The Commissioners of Big Horn County reported as part of its assets valid and unpaid and delinquent taxes of the value of $1,500. The court found that on the date of the organization of Park County the amount of delinquent taxes due to Big Horn County was $31,500; that there had been

collected of said taxes $23,038.58, including the amount for which tax sale certificates had been issued to the county, and that the value of the taxes remaining uncollected was $2,500. It is contended for Park County that there was no competent evidence to reduce the value of such uncollected delinquent taxes below the amount shown on the tax books, viz.: $8,461.42.

The evidence on the subject of the value of these taxes consisted of the testimony of the treasurer of Big Horn County, the deputy treasurer, and the last preceding treasurer. They were permitted, over objection, to state what efforts had been made to collect said taxes, and their opinion as to the collectible amount thereof based upon the age and character of the taxes and the knowledge acquired through the efforts made to collect them. It appeared from that evidence that diligent and persistent efforts to collect had been made by the respective treasurers and deputies; that the greater part of the taxes were for the years 1905 to 1910, inclusive, and so far as the same could be collected by sale of lands assessed or covered by the tax lien, that had been done; that the remaining delinquent taxes were levied either upon lands not described or personal property, including improvements upon lands not described; that $940 thereof were taxes for 1905, $1,050.31 for 1906, $822.20 for 1907, $1,001.41 for 1908, $1,302.13 for 1909, and $1,815.46 for 1910, and $1,521.91 for taxes levied prior to 1905. As estimated by said witnesses not more than $1,500 of the total amount was collectible. While it appeared that some of the parties assessed had removed from the state and some of the personal property may have been removed, there was no attempt to show what proportion of all the taxes were uncollectible because of such removal. And it seems to be the contention that it was competent to reduce the value of the taxes below the amount thereof only by evidence showing the removal of persons or property or that the collection had been enjoined; such contention being based upon what was said by this court in the case involving the apportionment of indebtedness between Big Horn County after

its organization, and the parent counties of Fremont, John-
son and Sheridan.   (In re. App't. Fremont & Big Horn
Co.'s, 8 Wyo. 1, 54 Pac. 1073.)   That case was before this
court on reserved questions, and in considering the char-
acter of unpaid delinquent taxes as an asset of the parent
county it was said:

"As a general proposition, we think it must be conceded
that uncollected taxes, which when paid to the county will
constitute a part of its revenue, are assets or credits.  Taxes
levied for common school purposes, or special levies for
school districts, which when collected are payable only to
the various districts, are not to be regarded in the appor-
tionment.   The proceeds of such taxes do not swell the
county revenue, and are not employed in the conduct of the
ordinary county affairs, nor in the discharge of its financial
obligations.  Taxes levied for state purposes should operate
as assets of the county, a proportionate share of the value
of which ought to be credited to the new county, provided
the debt of the old county for deficiency due the state is
accounted as an indebtedness.  Otherwise not.  *  *  *  *
The extent to which the delinquent taxes are to be com-
puted as assets ought not perhaps to be determined by the
aggregate amount upon the rolls.  The collection of some
of them may possibly have been enjoined by a court of
competent jurisdiction.  Others, especially for former years,
may have become absolutely uncollectible by reason of re-
movals of persons and property from the state.  *  *  *  *
Prima facie, no doubt, all the taxes shown upon the rolls
are valid and collectible, and should, in the absence of any
showing to the contrary, be so presumed.  The statute
seems to contemplate that the value of the credits is the
matter to be taken into account.  Generally, then, the value
of the delinquent taxes subject to the exceptions above
noted, stand as an asset for appropriate consideration in
making the ultimate award."

The statement above quoted that the collection of some
of the taxes may have been enjoined and others may have
become uncollectible through the removal of persons or

property from the state was clearly not intended as a statement of all the reasons or facts which might authorize a deduction from the amount on the tax list in ascertaining the value of delinquent taxes; the reasons mentioned were stated merely by way of illustration in explaining the necessity for ascertaining the value of the taxes instead of charging the old county with the amount appearing upon the books. The words, "subject to the exceptions above noted," in the concluding part of the paragraph above quoted referred to school or state taxes not properly chargeable against the old county. The witnesses aforesaid having stated the years for which the taxes were due, upon what class or classes of property the same had been levied, and the efforts made to collect them, we think it was competent for them to state their opinion as to the amount remaining collectible, not as necessarily binding upon the court, but to be considered in connection with the facts and given such weight as they might be deemed entitled to in determining the value for the purpose of arriving at a just and equitable apportionment of the indebtedness of the old county. In the case above cited this court referred approvingly to the remarks of the court in Forest County v. Langlade County, 91 Wis. 543, 63 N. W. 760, 65 N. W. 182, to the effect that the Legislature intended that all matters of property, debts, assets and liabilities of the parent county should be adjusted upon principles of justice and equity, rather than by technical rules of law; that strict rules of law are difficult of application to such matters and often produce unfair results; that no relation of debtor or creditor in any strict sense existed between the old and new counties; and that what is just and fair is more to be regarded than the application of strict rules of law.

But it is further argued that such opinions are not entitled to consideration and should have been excluded for the reason that the witnesses improperly based their estimate of value upon the cost of collection. It is true that the deputy treasurer testified that it would cost practically all the taxes are worth to collect them, and for that reason

they were of no value to the county. And the treasurer,·
Mr. Burnham, also stated that many of the taxes would
have little value above the cost of collection. But the latter
testified that his estimate of the amount collectible was
based also upon the unsuccessful result of the efforts to
collect and the fact that the property assessed was not de-
scribed on the tax books. And Mrs. Murphy, the former
treasurer, testified as to the amount collectible from her
knowledge of the tax rolls and the efforts to collect, having
described the efforts made by her and a deputy during her
term of four years by stating that she did everything that
was available, that the first year of her term she had sent
out notices of the taxes for the preceding five years, and
that her deputy traveled every district to collect all that was
possible. She estimated that 15 per cent of the personal
taxes would be collectible and about 75 per cent of the
taxes on real estate, but she was unable to say what pro-
portion of the remaining taxes had been levied on real
estate. However, it appeared from Mr. Burnham's testi-
mony that all the real estate covered by the taxes had been
sold. We are not prepared to hold that necessary items
of expense not chargeable to the tax payer may not be con-
sidered in ascertaining the value of delinquent taxes for the
purpose of the apportionment. But that question need not
be decided. The court found the value to be $2,500, an
amount much in excess of that reported by the old county
and estimated by the witnesses, evidently basing it upon the
character of the taxes and the repeated efforts from year
to year to collect them, and intending to fix the value at a
fair and just amount and as high as would be reasonably
consistent with the facts. We see no reason for disturbing
the finding in that respect or the judgment on that account.
The large amount of delinquent taxes that had been col-
lected after the organization of the new county furnishes
strong evidence of diligence on the part of the old county
and its officers. In view of the character of the property
covered by the remaining taxes and the fact that a large
proportion had been levied several years back, it does not

seem probable that a reconsideration of the matter would result in showing a value substantially greater than that found by the court.

3. Park County's answer alleged that the County of Big Horn owned the library building located on the court house square in the town of Basin (the county seat of said county), and that the same was of the reasonable value of $15,-ooo. That building had not been reported as property of the county. And upon the evidence the question arose whether the old county should be charged with the amount of the taxes levied for the support of the library that had been expended for books. The court found as to these matters substantially as follows:

That on December 8, 1908, the Board of Commissioners of Big Horn County made and executed a lease of a tract 200 feet by 300 feet in the southwest corner of the court house square to the Big Horn County Library Association for the term of 99 years, for the use of a public library. That said Library Association was at that time acting as a corporation under the provisions of the statute contained in Chapter 101, Compiled Statutes of 1910, and on the ground covered by said lease a library building was erected prior to January 3, 1911, by and under the direction and control of said association with funds derived by gift from Andrew Carnegie in the sum of $15,000; and that on the date last mentioned the value of the building was $15,000. That prior to said date Big Horn County had from time to time levied a library tax provided for by said statute, and that the Library Association, acting under authority of the statute, had expended $679 of the funds resulting from such tax in the purchase of books for the library.

These findings are sustained by the evidence. The lease referred to recites that it is between the Board of County Commissioners of Big Horn County as the party of the first part, and the Big Horn County Library Association, a corporation doing business under the laws of the State of Wyoming, as the party of the second part, that said county board has demised and leased the premises aforesaid (de-

scribing the same), to said Library Association: "To have and to hold the above described premises with the appurtenances, unto the said party of the second part, for the period of 99 years from the date of this agreement, and the said party of the second part, in consideration of the lease of the premises aforesaid * * * * does covenant and agree * * * * that said above described premises shall be used solely for the purpose of erecting a library building upon said premises, together with such other appurtenances as may be necessary in the premises." The lease also recites that it was made pursuant to a resolution of the board made and entered April 8, 1908. The material part of that resolution reads as follows:

"WHEREAS, The Board of Directors of the Big Horn County Library Association has made application to Andrew Carnegie requesting him to donate a free public library building to Big Horn County, Wyoming, to be located at Basin, the county seat of said county; and,

"WHEREAS, One of the conditions precedent to such donation is that the support of said library must be guaranteed; now, therefore, be it

"*Resolved*, We, the Board of County Commissioners of Big Horn County, hereby pledge to the said Big Horn County Library Association a sufficient sum of money to be raised by a special tax levied upon the taxable property of Big Horn County and not exceeding one-half of one mill per dollar valuation per annum for the support of a free public library to be located at the county seat of said county. Be it further

"*Resolved*, That permisson is hereby granted to said Board of Directors of said Library Association to erect a library building upon the court house square in the town of Basin, the particular site to be selected by said Board of County Commissioners, and said Board of Directors."

On August 5, 1908, the following resolution was adopted by the Commissioners:

"WHEREAS, Andrew Carnegie has made a proposition to Big Horn County, Wyoming, as follows, to-wit: That if

the Board of County Commissioners will pledge the sum of fifteen hundred dollars per year to support a free public library for Big Horn County, he, the said Andrew Carnegie, will donate the sum of fifteen thousand dollars for the purpose of erecting a building for the use of said library. The said Board of County Commissioners are also to furnish a site for said building; now, therefore, be it

"*Resolved,* By the Board of County Commissioners meeting in regular session on this 5th day of August, 1908, that we, A. C. Newton, L. J. Willis and A. A. Linton, the duly elected, qualified and acting Board of County Commissioners within and for said county and state, hereby promise and pledge the County of Big Horn, State of Wyoming, to put into the treasury of Big Horn County Library Association, the sum of fifteen hundred dollars a year for the support of a free public library to be located at Basin, the county seat of said county, and we further agree to furnish a site for a library building."

On January 3, 1911, the Library Association made a report to the County Board, setting forth among other things that the library had been located in the "Carnegie Library Building," and that several donations had been made to the library, including the gift of $15,000 by Andrew Carnegie. The communication making that gift is not in the evidence, for the reason, as we understand, that it could not be found. But we think the effect of the evidence is that the fund was received and expended by the library board and the building erected by them, acting for the association. As part of that evidence, the record of a meeting of the Board of Directors of said association was introduced and received, showing that at said meeting held on September 7, 1908, "the letter of Andrew Carnegie donating $15,000.00 was read, said money to be used in the erection of a suitable building for the convenience of the Big Horn County Library Association," and that the following resolution was adopted:

"*Be It Resolved,* That the Big Horn County Library Association through it Board of Directors hereby accepts the

donation of Andrew Carnegie of $15,000.00 and that all said sum be used for the erection of a library building."

And further that the secretary reported that the Board of Commissioners of Big Horn County had donated to the public library a site for said building upon the public square, and resolutions were adopted extending the thanks of the library board for these donations to the respective donors. And one of the witnesses who had been a director at one time testified that the money donated was sent to the treasurer of the library board.

The court found and stated as conclusions of law from the facts found as to the library, that neither the value of the library building nor the sum expended for books should be considered in determining the assets of Big Horn County for the purpose of the apportionment. These conclusions are assigned as error.

The statute referred to in the findings was enacted in 1886 and was entitled: "An Act to promote the public welfare by encouraging the establishment of free public libraries." With some slight and immaterial amendments the statute remains in force, and constitutes Chapter 101, Compiled Statutes of 1910 (Secs. 1316-1321). The first section (1316) provides in substance that when the commissioners of any county have received proper and sufficient guarantees, either in the form of conveyances, bonds of citizens, associations or corporations, that a suitable place will be permanently furnished for the protection and use of a public library as a condition precedent to their own action, under the provisions of said chapter, they shall levy annually a tax not less than one-eighth of a mill nor more than one-half of a mill on all taxable property in the county, for the establishment and maintenance of a public library at the county seat; and that whenever a suitable place is furnished without rent "for the use of any county library" the directors thereof shall have power to pay necessary incidental expenses in keeping the place so furnished in repair and properly janitored, lighted, heated and cared for, out of the taxes levied as aforesaid. It is also

provided (Sec. 1319) that when no provision can otherwise be made for a place for the library, without expense to the library fund, the trustees of the school district embracing the county seat shall provide a place in the best situated school building under their control.

The statute further provides (Sec. 1318) that the control and use of the library fund shall be entrusted by the County Commissioners to a Board of Directors consisting of three competent and responsible citizens of the county, to be appointed by said commissioners, who shall, as soon as appointed, incorporate as a body with an appropriate name, and serve without compensation, and whose treasurer shall give bond to be approved by the commissioners for the faithful performance of his duties. And, further, in Section 1319: "The Board of Directors is authorized to receive donations of real estate, money, or books, in aid of the establishment or maintenance of the library, for which said directors are hereby made responsible, and, as trustees of the donor, shall carefully observe the conditions accompanying every such gift." It is declared (Sec. 1320) that every such library shall be free to all residents of the county to which it belongs, on the condition that they comply with such rules and regulations as the Board of Directors may prescribe for the safety and management of the library.

The acceptance by the library association or board of the Carnegie donation and the lease from the County Commissioners, and their erection and control of the building, were certainly not opposed to either the letter or the spirit of the statute. On the contrary, the statute expressly provides that the Board of Directors of the library may receive donations of real estate, money or books, and that the directors, as trustees of the donor, shall observe the conditions of the gift, without granting like authority to the county board or authority to that board to provide or erect a building for the library at public expense. As a condition precedent to the levy of a tax for establishing and maintaining the library the County Commissioners must receive proper and sufficient guarantees that a permanent suitable place will be

furnished for the protection and use of the library, though when no other provision can be made for furnishing accommodations for the books, without expense to the library fund arising from the tax, it is made the duty of the school district board to provide such accommodations in the best situated school building at the county seat. What guarantees, if any, were received by the County Commissioners other than the proposed or anticipated Carnegie donation does not appear, but from the fact that the resolution of the Commissioners providing for the tax for the support of the library referred to the conditions of the donation of a library building, it would seem that the donation had been promised upon the conditions stated; and the money for the building having been donated the Commissioners may have considered that a sufficient assurance that a suitable place for the library would be permanently furnished to authorize the tax provided for.

The statute, moreover, provides for a separate incorporated body or association to control and use the library fund raised by the tax, and to manage and control the library. Upon the facts, in view of the provisions of the statute, we think it clear that the library building as well as the books purchased out of the library fund are the property of the library association; somewhat if not quite analogous to a school district's ownership of school houses and other school property. The library is called a county library not because either the building erected or provided for its use or the books are county property, but because they are for the use of the residents of the county. The statement in the resolution of the County Commissioners referring to the proposed Carnegie donation, that the library board had requested Mr. Carnegie to donate a library building to Big Horn County, is not controlling. That may have meant merely that the application was for a building to be erected in said county for the use of its residents. The Commissioners no doubt had in mind the establishment of a library in the county under the statute aforesaid, or the donation of a building for such a library already established, and this

is indicated by their resolution aforesaid of August 5, 1908. We find no warrant for the suggested interpretation of the statement aforesaid that the building was to be donated to the county to be held and owned by it as county property. In any event it cannot overcome the effect of the facts of the donation and the erection, control and use of the building, considered in connection with the statutory provisions aforesaid. We conclude as to this matter that the District Court did not err in excluding from the apportionment the value of the building and the tax money used for the purchase of books.

It is contended in this connection that there was no proper or sufficient proof of the incorporation of the library association. But we think that immaterial. The evidence clearly shows that the library was being conducted under the provisions of the statute aforesaid, and that it was recognized as such and as a corporation by the county authorities, and also that the directors acted as a corporate body, using a corporate seal, and had at least signed a certificate incorporating as a body pursuant to the statute. The library association is not a party to this proceeding nor asking any relief. And an entire failure to show that it had been duly incorporated would not make the county the owner of the property acquired by the directors in their capacity as such, or justify a finding that the building and books were county property. So far as the ordinary rules as to burden of proof may apply in a proceeding of this kind, the burden was upon Park County to establish its claim that the property was public property of Big Horn County.

4. It is contended that the evidence is insufficient to sustain the finding as to the value of the court house square. The evidence on the subject was conflicting and we think there is sufficient to sustain the finding. The trial court was in a much better position than this court is to determine the weight to be given the testimony of the several witnesses, and we perceive no reasonable ground for holding that said court did not give proper consideration to the

evidence or that it failed to decide the matter justly and fairly.

5.   Park County claimed that there should be deducted from the amount of the indebtedness of the original county the value of the record books in the several county offices on the date of the organization of the new county.   Evidence was introduced by Park County to show the number and value of such records, the value being based upon the estimated original cost of the books and what it would cost to transcribe the recorded matter therein.   According to the evidence the books referred to included 54 in the county treasurer's office, consisting of assessment rolls, tax lists and other tax records, cash books, warrant and license books; 16 in the office of the clerk of the District Court, consisting of the court journals and other court records; and 172 in the office of the county clerk and ex-officio register of deeds, embracing the books containing the record of deeds, mortgages, and other conveyances and instruments affecting the title to property, certificates of incorporation, marriage licenses, abstract books, the clerk's fee book and ledger, and the commissioners' journal.   The court stated in its findings of fact the number and the cost of producing them, including the average original cost of the books and the cost of transcribing the records therein, accepting for that purpose the testimony of the only witness examined on the question, that the average original cost of the books would be $20 each and the clerical work of recording $150 each, totaling $41,140; but found as a conclusion of law that such cost or the value based thereon should be excluded from consideration in the apportionment proceeding.   In contending that the court erred in that conclusion, and that such record books are public property within the meaning of the statute requiring that the new county's proportion of the value of all public property of the original county shall be deducted from its proportion of the existing indebtedness, counsel for plaintiff in error relies upon the case of State v. Amundson, 23 N. D. 238, 135 N. W. 1117.

It appears from the opinion in that case that the statute required that from the total of the outstanding indebtedness of the original county there shall be deducted "the amount of outstanding bonds given or money paid for public property owned by and remaining within the limits of the original county." Construing that provision of the statute, it was held that the amount expended by the original county in the purchase of permanent record books for use in its various county offices must be deducted from the indebtedness, and the court said: "These record books are not only of great value, but they are indispensable, and they clearly constitute public property owned by Ward County within the meaning of Subd. 2 of Sec. 2336, Rev. Codes. The fact that they may not have a commercial value is not made a controlling test or any test under the above statute. If they are public property and owned and retained by the County of Ward, as they most certainly are, then their cost price must be accounted for and deducted from the total indebtedness of Ward County on such settlement; for such is the plain legislative mandate, regarding the wisdom of which mandate the courts have no concern."

It is not definitely stated in the opinion or in the case as reported whether the item thus held chargeable against the original county was merely the amount expended in the original purchase of the books, or included the cost or expense of the recording, though the language of the opinion and the amount of the item would each seem to indicate that the original purchase price was all that was considered. But the statute considered in that case is very different from our own, and the case cannot for that reason be regarded as authority for the proposition that under our statute the value of the record books aforesaid constitute an asset of the old county to be considered in apportioning its indebtedness.

Such books are no doubt public property and in a sense or for some purposes to be regarded as public property of the county. But the several officers are declared by statute to be the custodians of the records in their respective offices,

and most of them are provided and kept for the convenience and benefit of the public or persons interested, whether residents of the county or not. And, in our opinion, for seemingly obvious reasons, they are not the kind of property contemplated by the statute providing for this apportionment. The new county certainly does not need and could not use the District Court records and loses nothing by the fact that such records are retained in the office of the clerk of the court in the parent county; and the same is true as to the records retained in the office of the county treasurer. The tax books contain the record not only of taxes levied and collected for county purposes, but also those levied and collected for state and school district purposes, and in more recent years, though since the organization of Park County (Laws 1913, Ch. 85), of the taxes levied and collected for cities and towns within the county. And a sum equal to one per cent of the amount collected of city or town taxes is required to be deducted therefrom by the collector and turned into the county treasury to reimburse the county for the extra expense for stationery and clerical services in assessing and collecting such municipal taxes. (Id., Sec. 5.)

The annual contribution of the tax-payers toward the expense of providing the books and recording therein the various matters required to be entered or recorded is not on a different footing from their contribution for any other ordinary expense of maintaining the county offices.; and the residents of the new county have the same access to the District Court records and the tax records and other record books in the county treasurer's office as before the county division. A similar situation exists as to some of the records in the county clerk's office, notably the marriage records, the clerk's fee book and ledger, and the record of the meetings of the County Commissioners. Such books can be of no possible use to the new county, and to charge the old county with their value based upon their original cost and the estimated cost of entering the recorded matter therein would be equivalent to charging it with money ex-

pended in the purchase of stationery for the use of its officers and for salaries of officers and employees, a matter which might be extended indefinitely, and the effect might be to require the old county to return to the new county a certain proportion of the ordinary expenses of maintaining the several county offices for the several years preceding the county division which might equal or exceed the proportion which may have been contributed for that purpose by the tax-payers in the territory taken to form the new county. That is certainly not the theory of the statute providing for the apportionment of the old county's indebtedness. The new county is interested in the public records affecting the title to the property within its boundaries, and that interest and the convenience of the public require a duplication of such records to be kept in the proper office in the new county. But that matter is regulated by statute which prescribes a rule concerning it inconsistent with the proposition that the record books and records remaining in the old county are public property to be accounted for in the apportionment proceedings.

At the date of the organization of Park County it was provided by statute that the county clerk of the county out of which any new county may be formed shall, upon request of the Commissioners of the new county, procure a proper record book or books and carefully and accurately transcribe therein the records of all deeds, mortgages, maps and other instruments in any wise affecting the real or personal property situate within the boundaries of the new county, and certify the same as a true and correct transcript of such original records, and thereupon transmit the same to the county clerk of the new county, who shall index and abstract in a proper book all instruments so transcribed, which transcript shall be received in evidence and have like effect in all other respects the same as if the instruments had been filed for record in the new county; and that the county clerk preparing the transcript shall receive for such services a stated compensation in addition to the actual cost of the record book or books, to be paid out of the county funds of

the new county.   (Comp. Stat. 1910, Sec. 1257.)   These
provisions were originally contained in a section of the law
providing the procedure for organizing new counties (Laws
1888, Ch. 90, Sec. 59) which was enacted subsequent to the
statutes providing for and regulating the proceedings for
apportioning the indebtedness of the original county.   The
section was amended and re-enacted by an act approved
February 21, 1911, so as to provide that the county clerk of
the original county, instead of preparing the transcript, shall,
upon request of the Commissioners of the new county, or
any bonded abstract company, permit some person or per-
sons authorized by the Commissioners of the new county,
or such bonded abstract company, at the expense of the
new county or bonded abstract company, to transcribe or
photograph the records aforesaid in books furnished by the
new county, and that the county clerk of the old county shall
compare the records or instruments so transcribed or pho-
tographed with the original instruments or records in his
office, and certify the same as a true and correct transcript,
and transmit the same to the county clerk of the new county
or such bonded abstract company, and fixing the compensa-
tion of the county clerk for his services in so comparing
and certifying to the transcript and providing that the same
be paid by the new county.   (Laws 1911, Ch. 80.)

Having thus required the new county to pay the expense
of obtaining the necessary records, we think a rule is estab-
lished excluding the records and record books from consid-
eration in apportioning the indebtedness of the old county.
It is not reasonable to suppose that the Legislature would
have made this provision expecting the new county to be
reimbursed by the old county for its expense in obtaining
the records either directly or by being credited with the
value of the records as public property of the old county.
The statute makes no provision for such reimbursement
and there is nothing to indicate an intention to that effect.
Had it been so intended the Legislature would, we think,
have provided either for dividing the expense or placing the

entire burden upon the old county, without leaving the matter to the uncertainty of an apportionment proceeding.

6. The court found that of the total outstanding warrants of Big Horn County on January 3, 1911, some of them upon which the principal and interest amounted to $1,287.43 had been issued and outstanding more than one year prior to December 1, 1910, and that at a meeting of the Commissioners in December, 1910, a resolution was passed ordering warrants issued more than twenty-four months prior thereto to be cancelled; the total amount thereof, including principal and interest, being $1,108.76. The court held and stated as a conclusion of law that of such warrants those issued more than one year prior to December 1, 1910, and less than five years prior to January 3, 1911 (the date of Park County's organization) should be included as a part of the indebtedness of Big Horn County. It is contended that this was error, though the matter is not discussed in the brief of plaintiff in error further than by stating that the court should have deducted the amount of such warrants from the amount of the indebtedness. The warrants were no doubt cancelled pursuant to the provisions of Sections 1201 and 1202, Compiled Statutes, 1910. Section 1201 provides that the county treasurer, on the first Monday of December of each year, shall certify to the Board of County Commissioners the number and amount of each county warrant or county certificate of indebtedness unpaid and which has been issued for a period exceeding twelve months; that the Board of County Commissioners shall cause such list to be entered upon its journal, and thereupon make an order cancelling each and every such warrant or certificate of indebtedness, and that such order shall have the effect of cancelling such obligation. Section 1202 provides that any person holding such cancelled warrant or certificate of indebtedness may present the same to the county board at any subsequent time, not later than five years after the date of the warrant or certificate, for the action of the board in the matter of reimbursement of the amount to the holder thereof. These two sections were en-

acted in 1909 and constituted the only sections of Chapter 127 of the Laws of 1909, except the section stating when the act should take effect.  The title of the act was as follows: "An Act authorizing the cancellation of county warrants or county certificates of indebtedness, and how the same may be accomplished, and providing how such cancelled warrants or certificates may be paid."  We do not know the object of these provisions unless it was to stop the accumulation of interest.  It is clear that it was not intended to cancel the debt.  The concluding words of the first section, that "such order shall have the effect of cancelling such obligation," must refer to the obligation of the warrant or certificate rather than the original debt for which the warrant or certificate may have been issued, since provision is made in the next section for paying the amount of the warrant or certificate to the holder.  The five-year period from the date of the warrants or certificates so cancelled not having elapsed at the date of the organization of the new county, they remained an obligation of the county, though, if the statute be given its full effect, it would require further action on the part of the board to authorize payment by the treasurer.  It not appearing that the county had been relieved of its liability to pay the amount of the cancelled warrants and certificates, we think the court correctly found that they should be included as part of the indebtedness.

7.  It is contended that the trial court erred in denying the motion of Park County for more specific findings of fact in certain particulars.  The motion was to the effect: (1) That the court make and enter a finding as to the amount of valid and collectible taxes due Big Horn County on January 3, 1911.  (2) That a finding be made and entered stating when the outstanding indebtedness of Big Horn County became or becomes due and what rate of interest, if any, such indebtedness bears.  (3) That the court make and enter a finding stating to whom the Andrew Carnegie donation of $15,000 was made.  (4) That a finding be made and entered stating to whom the library building belonged on January 3, 1911.  (5) That the court make

and enter a finding stating the value of the court house square without excluding the site on which the library building is located.

The finding as to the delinquent taxes was clearly sufficient. It stated the amount thereof on the date of the organization of Park County, the amount that had been collected up to the time of the hearing and the amount and value of those remaining uncollected. The evidence did not refer to the taxes in detail, and all the court could do was to value the same upon the facts brought out in the evidence referred to in an earlier part of this opinion.

Big Horn County alleged in its report that its bonded indebtedness consisted of $33,300, bearing interest at the rate of six per cent per annum, interest payable semi-annually on January 1 and July 1, and that the principal became due and payable at the rate of $3,700 on September 1, 1911, and annually thereafter on the first day of September of each year, up to and including September 1, 1919. It was stipulated on the trial that at the date of the organization of Park County such bonded indebtedness consisted of $30,300 principal, and interest for three days at six per cent amounting to $15.15. This was all the evidence as to the bonded indebtedness. The warrants and judgments were presumably already due and the statute fixes the rate of interest thereon, viz.: eight per cent per annum on the judgments and six per cent per annum on the warrants. There appears to have been no controversy as to the bonded indebtedness, and the stipulation as to the amount and rate of interest, without stating the date of maturity, must have been regarded by counsel as sufficient for the purpose of the apportionment. The stipulated amount of that indebtedness was that stated in the answer of Park County, such answer omitting to state the date of maturity of the principal. The court found the amount of the judgment indebtedness and of the outstanding warrants. It was not necessary to make a finding as to the rate of interest fixed by the statute. The ground upon which the motion is based for a specific finding as to the date when the outstanding

indebtedness became due, and the rate of interest thereon, we understand to be based upon the provisions of the statute requiring those facts to be stated in the report of the Commissioners of the original county, and that the court, upon finding the amount to be charged to the new county, shall order that its Board of County Commissioners issue its warrants payable to the order of the original county at a time not later than the time when the indebtedness shall become due, and bearing the same rate of interest. The net amount chargeable to the new county on the date of its organization was found to be $11,310.72, and interest thereon was allowed at the rate of six per cent per annum to the date of the judgment, the same amounting with said interest to $14,674.32. It was ordered that the Commissioners of Park County issue a warrant for said sum of $14,674.32 payable to the treasurer of Big Horn County on or before January 1, 1917, and bearing interest at the rate of six per cent per annum. Thus the court provided for interest in each instance at the lowest rate borne by any of the indebtedness. The amount to be paid by Park County was considerably less than the bonded debt, and if the warrant was ordered payable at a time later than the time when such indebtedness would become due Big Horn County is not objecting thereto and it does not seem that Park County can be prejudiced thereby.

We have stated the findings of the court as to the library building in discussing the principal question raised with reference thereto and we think those findings sufficient without a more definite statement that the building belonged to the Library Association or to whom the Carnegie donation was made.

The finding as to the value of the court house square was in substance that Big Horn County was the owner of what is known as the court house square in the city of Basin, consisting of 11.25 acres; that a lease of a part thereof consisting of a tract in the southwest corner 200 feet by 300 feet was made and executed for a period of 99 years by the Commissioners of Big Horn County on December 4,

1908, to the Big Horn County Library Association; that the value of the court house square, subject to said lease, and including the building thereon known as the county offices and the county jail was the sum of $10,000. Thus the site on which the library building is located was not excluded from the finding as to the value of the court house square, but the latter was valued subject to the lease, and we cannot see that that was improper. We see no prejudicial error in the denial of the motion for more specific findings.

For the reasons aforesaid, the judgment will be affirmed. BEARD, J., concurs.                                    *Affirmed.*